**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| ROLAND MARTIN, ELWIS JOHNSON, TREVOR EDWARDS, SHAWNA KNUTSON, SANTORIA TEXIDOR, AND ALONZO HINTON, <br><br> Plaintiffs, <br><br> v. <br><br> EDWARD D. JONES & CO. L.P., AND THE JONES FINANCIAL COMPANIES, L.L.L.P, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES** <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Roland Martin, Elwis Johnson, Trevor Edwards, Shawna Knutson, Santoria Texidor, and Alonzo Hinton ("Plaintiffs") bring this action against Defendants Edward D. Jones & Co., L.P. and The Jones Financial Companies, L.L.L.P. (collectively, "Edward Jones") on behalf of themselves and all others similarly situated, and allege upon information and belief, as follows:

## INTRODUCTION

1. This case concerns systemic race discrimination against Black employees in the financial services industry. For many years, Edward Jones has knowingly paid its Black financial advisors ("FAs") less than similarly situated white peers. These pay disparities are primarily attributable to two centralized policies: (1) Edward Jones' client transfer policy ("CTP"), which disproportionately provides white FAs – and not Black FAs – with client accounts (or "assets") that enable them to meet performance expectations and earn commissions and bonuses; and (2) Edward Jones' Salary Assignment Policy ("SAP"), which sets starting salary based on the compensation FAs earned immediately prior to starting with Edward Jones – a practice that is well-

understood to perpetuate market discrimination. As a result of these policies, Edward Jones' Black FAs receive less compensation, fewer promotions, and are terminated more frequently than their white peers.

2. Edward Jones is a retail brokerage that provides financial products, advice, and services to clients in the United States and Canada. It manages over 9 million client accounts and over $2.5 trillion worth of client assets. To handle this wealth, Edward Jones employs over 20,000 FAs, including around 15,000 in the United States.

3. To succeed as an FA at Edward Jones, an FA must maintain and grow a book of business. The more assets an FA has under care, the higher their compensation and the more secure their future with the company will be. As assets increase, so do commissions – which is a large portion of FAs' compensation (increasingly so over time). Greater assets also yield larger bonuses because such bonuses are tied, in part, to the revenue generated through client accounts. Furthermore, existing assets determine an FA's career trajectory. Edward Jones evaluates FA performance primarily on asset maintenance and growth. Should FAs fail to meet Edward Jones' asset and revenue benchmarks, they are placed on a performance improvement plan ("PIP") and often terminated.

4. Edward Jones has centralized control over its client accounts. While FAs manage their clients and build a book of business, FAs do not own their accounts. FAs are simply employees of Edward Jones. At all times, Edward Jones maintains ownership over the accounts. If an FA leaves the company or retires, Edward Jones retains the accounts and distributes them to other FAs to service.

5. Edward Jones regularly transfers client assets from one FA to another for two primary reasons: to redistribute the accounts of retiring or departing FAs (known as "Retirement"

2

transfers or "Open Office" transfers) or to permit a senior FA to offload client assets to a different, often more junior, FA (known as "Goodknight" transfers). Edward Jones' CTP governs the transfer and distribution of client assets. While individual FAs can request to make specific transfers, Edward Jones' leadership and corporate office ("Home Office") oversees and approves all such asset transfers.

6. Edward Jones' CTP discriminates against Black FAs. White FAs on average can receive tens of millions of dollars' worth of client accounts upon starting as an FA, which generate substantial commission revenue and put them on the path to success. Upon information and belief, Black FAs on average receive far fewer assets – if any at all – and the quality of those assets is far more likely to be poorer. These disparities compound over time, with Black FAs receiving less compensation and fewer career advancement opportunities than their white peers. Plaintiffs here are Black FAs who experienced this discrimination. Their core story is common to Black FAs across the country.

7. Although Edward Jones' CTP has a clear disparate impact on Black FAs, this is not simply a disparate impact case. Edward Jones *knows* that Black FAs are compensated less than their white peers, but has done little to correct this discrimination. For many years, Edward Jones has tracked the compensation and demographic data of its FAs. And in 2018, in recognition of the growing pay gap between white male employees and the rest of the company, Edward Jones began providing incentive payments for FAs to make "Goodknight" transfers to women and people of color.[1] But these minimal efforts did not close the pay gap. And in 2021, Edward Jones paid $34 million to settle a case brought by a group of Black FAs who sued based on these same

---

[1] Notably, Edward Jones abandoned this incentive policy in 2025. *See* https://www.advisorhub.com/edward-jones-cancels-incentive-for-transferring-accounts-to-women-minorities/.

discriminatory asset transfer policies.  *See Bland v. Edward D. Jones & Co., L.P.*, Case No. 1:18-cv-03673 (N.D. Ill.), ECF No. 119-2 (Settlement Agreement), Sec. VII (Mar. 19, 2021).  As part of this settlement, Edward Jones agreed to programmatic relief designed to address racial equity at the firm, such as diversity reporting to executive leadership and establishing a Financial Advisor Advisory Council to identify and address issues facing Black FAs.  *Id.*  Despite the *Bland* settlement, Edward Jones has still not meaningfully changed or remedied its past practices, which continue to harm Black FAs today.

8.      As a result of this intentional treatment, Edward Jones has discriminated – and continues to discriminate – against Plaintiffs and Black FAs through its CTP and SAP.  Black FAs nationwide have been disproportionately terminated and denied equal compensation and business opportunities relative to their white counterparts.  Edward Jones' conduct and omissions violate the Civil Rights Act of 1866, as codified by 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C § 2000e, *et seq.*; the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*; the New York Equal Pay Law ("NY EPL"), N.Y. Labor Law §§ 194 *et seq.*; the New York State Human Rights Law ("NYSHRL"), Executive Law §§ 296-301; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code §§ 8-107 *et seq.*; and the Minnesota Human Rights Act ("MHRA"), Minn. Rev. Stat. § 363A.08.

## **JURISDICTION AND VENUE**

9.      This Court has original subject matter jurisdiction over Plaintiffs' Section 1981 and Title VII claims pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 and the Class Action Fairness Act, 28 U.S.C. § 1332(d).

10. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)-(d) and 42 U.S.C. § 2000e5(f)(3) because Edward Jones resides in this district, a substantial part of the events and omissions giving rise to the claims herein occurred here, and this is the district in which the employment records relevant to the claims are maintained and administered.

12. Pursuant to E.D.Mo. L.R.2.07, assignment to the Eastern Division is proper because Edward Jones resides in this division.

13. Plaintiffs alleging claims under Title VII have exhausted their administrative remedies and complied with all statutory prerequisites.

14. Plaintiff Texidor filed a charge of race discrimination individually and on behalf of all similarly situated Black FAs employed by Edward Jones with the Equal Employment Opportunity Commission ("EEOC") on October 7, 2025, and filed an amended charge on October 21, 2025. The EEOC dismissed Plaintiff Texidor's charge and issued her a Notice of Right to Sue on February 19, 2026.

15. Plaintiff Edwards filed a charge of race discrimination individually and on behalf of all similarly situated Black FAs employed by Edward Jones with the EEOC on December 1, 2025. Pursuant to the work-sharing agreement with the New York City Commission of Human Rights, his charge is considered dually filed with the NYCCHR. The EEOC dismissed Plaintiff Edwards' charge and issued him a Notice of Right to Sue on May 6, 2026.

16. Plaintiff Knutson filed a charge of race discrimination individually and on behalf of all similarly situated Black FAs employed by Edward Jones with the EEOC on October 20, 2025. The EEOC's investigation into this charge is currently pending.

## PARTIES

**Plaintiffs**

17. Plaintiff Roland Martin is a Black man and a resident of Alameda County, CA. Plaintiff Martin worked as a Financial Advisor for Edward Jones from around July 2012 until September 2022. At all relevant times, Plaintiff Martin was an "employee" of Edward Jones within the meaning of 42 U.S.C § 1981 and California law.

18. Plaintiff Elwis Johnson is a Black man and a resident of Pierce County, Washington. Plaintiff Johnson worked as an FA for Edward Jones in Lakewood, Washington from around July 2017 to March 2023. At all relevant times, Plaintiff Johnson was an "employee" of Edward Jones within the meaning of 42 U.S.C § 1981.

19. Plaintiff Trevor Edwards is a Black man and a resident of Kings County, New York. Plaintiff Edwards worked as a Financial Advisor for Edward Jones in Brooklyn, NY from around July 2023 to February 2025. At all relevant times, Plaintiff Edwards was an "employee" of Edward Jones within the meaning of 42 U.S.C § 1981, Title VII, and New York law.

20. Plaintiff Shawna Knutson is a Black woman and a resident of Crow Wing County, Minnesota. Plaintiff Knutson worked as an FA for Edward Jones in Pequot Lakes, Minnesota from around July 2023 to December 2024. At all relevant times, Plaintiff Knutson was an "employee" of Edward Jones within the meaning of 42 U.S.C § 1981, Title VII, and Minnesota law.

21. Plaintiff Santoria Texidor is a Black woman and a resident of DeKalb County, Georgia. Plaintiff Texidor worked as an FA for Edward Jones in Decatur, Georgia from around May to August 2025. At all relevant times, Plaintiff Texidor was an "employee" of Edward Jones within the meaning of 42 U.S.C § 1981 and Title VII.

22.     Plaintiff Alonzo Hinton is a Black man and a resident of Cook County, Illinois. Plaintiff Hinton worked as an FA for Edward Jones in Chicago, Illinois from around March 2023 to April 2024. At all relevant times, Plaintiff Hinton was an "employee" of Edward Jones within the meaning of 42 U.S.C § 1981.

**Defendants**

23.     Defendant The Jones Financial Companies, L.L.L.P. (the "Partnership") is a major financial services company incorporated in Missouri and doing business in the United States and Canada.  As a limited liability limited partnership, it has no board of directors; the Partnership is governed by a single Managing Partner with primary responsibility for administering the Partnership's business.[2]  The Managing Partner for the Partnership is Penny Pennington, who has held the role since 2019.

24.     Defendant Edward D. Jones & Co., LLP is the primary wholly owned subsidiary of The Jones Financial Companies, L.L.L.P.  It is a registered broker-dealer in the United States and, as a retail brokerage, "primarily derives revenue from fees for providing investment advisory and other account services to its clients, fees for assets held by clients and commissions for the distribution of mutual fund shares and insurance products and the purchase or sale of securities."[3] In 2024, Edward Jones generated over $16 billion dollars in revenue, including $13 billion from client fees.

---

[2]     The Jones Financial Companies, L.L.L.P.  2025 10-K ("2025 10-K"), at 3, *available at* https://www.edwardjones.com/us-en/why-edward-jones/about-us/financial-reports (click "Form 10-K" and navigate to report filed Mar. 13, 2026).

[3]     2025 10-K, at 3.

25.     Edward Jones employs over 20,000 Financial Advisors in the United States and Canada who manage over $2.5 trillion worth of client assets.  As of 2025, Edward Jones had 14,340 branch offices in the United States that employed at least one Financial Advisor.

26.     Edward Jones' headquarters, known as the "Home Office," is in St. Louis Missouri.[4]  Among other responsibilities, "Home Office personnel, including those in the Operations and Compliance divisions, monitor day-to-day operations to assess compliance with applicable laws, rules and regulations."[5]

<u>**FACTUAL BACKGROUND**</u>

27.     Edward Jones' leadership and Home Office personnel set compensation policies and practices for the firm.  These policies and practices apply uniformly to FAs working throughout the United States.

28.     Edward Jones' corporate leaders and FAs are predominantly white.  According to SEC filings, only 18% of Edward Jones' corporate leaders and only 10% of its FAs are "People of Color."[6]  Because the term "People of Color" includes many non-white races, an even smaller percentage of both groups are Black or African American.

**Client Transfer Policies**

29.     FAs are employees of Edward Jones.  As such, Edward Jones controls all client accounts and assets managed by its FAs.  When FAs retire, leave, or are terminated, they do not keep their Edward Jones client accounts.  Edward Jones transfers the accounts to other FAs in

---

[4]     In the United States, Edward Jones also maintains a "Home Office" in Tempe, Arizona. Unless otherwise indicated, references to Edward Jones' Home Office refer collectively to Edward Jones leadership and corporate management, regardless of the exact geographic location of specific Home Office personnel.

[5]     2025 10-K, at 4.

[6]     2025 10-K, at 9.

order to maintain control and continuity of its client base. In addition, senior FAs at Edward Jones may offer assets to more junior FAs for various reasons, such as to offload smaller accounts to free up capacity to focus on larger more lucrative accounts, or simply to assist more junior FAs who are struggling to bring in business. Edward Jones' CTP governs these asset transfers between FAs.

30. Edward Jones' CTP covers different categories of asset transfers, including those related to retirement ("Retirement Transition Plan"), firm departures ("Open Offices"), and for transferring assets from senior to junior FAs (the "Goodknight Plan"). Edward Jones' Home Office either designs or approves all such client transfers. Edward Jones also tracks each asset transfer and has done so since at least 2018.

31. The Goodknight Plan allows veteran FAs to distribute accounts to other more junior FAs who have limited existing assets. These transfers are commonly made to new FAs who have just joined the firm. The transfers are mutually beneficial: The transferring senior FA can free up capacity to work on more lucrative accounts, and the receiving junior FA will receive a headstart on building their book of business. Senior FAs that participate in the Goodknight program receive a financial incentive for doing so. From around 2018 until 2025, Edward Jones paid additional incentives to FAs who transferred assets to women and people of color.

32. Edward Jones knows that early asset transfers through the Goodknight program are critical to FAs' success or failure at the company. FAs who receive a sizeable asset transfer with quality accounts are more likely to meet performance metrics and generate revenue. Increased revenue, in turn, leads to higher compensation, discretionary bonuses, and better career opportunities, such as receiving open offices and administrative support, partnering with other senior FAs who can provide mentorship, receiving additional asset transfers, and promotions. In contrast, FAs who receive no assets or low-value and low-quality asset transfers will likely be

unable to develop a sustainable client base. These FAs are at greater risk of being placed on a PIP and eventually terminated.

33. Starting assets directly determine the amount of compensation FAs receive. Edward Jones determines compensation for FAs based on the value of FAs' accounts. It compensates FAs on a commission basis (along with a baseline salary), which is derived from the amount of revenue generated from client accounts. Edward Jones pays bonuses through a discretionary formula tied, in part, to the revenue generated by FAs through their client accounts. As such, FAs with a larger book of business are paid more than those with smaller books of business.

34. The CTP – particularly the Goodknight plan – permits senior FAs to choose which junior FAs receive their transferred assets. The result of this policy is that a predominantly white FA workforce transfers their client accounts to other white FAs, and not to Black FAs. They do so with the blessing of a predominantly white Edward Jones Home Office, which tracks and approves all client transfers.

35. Edward Jones enables bias among FAs, including because its hiring policies explicitly encourage nepotism. Edward Jones "encourages the recruitment of family and friends to be financial advisors," and acknowledges that it is "common for family members to be employed by" Edward Jones.[7] For example, Edward Jones' Managing Partner Penny Pennington's son in law is an FA with Edward Jones and earned approximately $372,000 during calendar year 2025.[8]

---

[7] The Jones Financial Companies, L.L.L.P. 2024 10-K ("2024 10-K"), at 85, *available at* https://www.edwardjones.com/us-en/why-edward-jones/about-us/financial-reports (click "Form 10-K" and navigate to report filed Mar. 14, 2025).

[8] 2025 10-K, at 85.

36. As a result of Edward Jones' CTP, white FAs often receive tens of millions of dollars' worth of client accounts when starting as an FA (and throughout their tenure) which puts them on the path to success. In contrast, Black FAs on average receive far fewer assets – if any at all – and those assets are often low-quality accounts that fail to generate any income. These income and opportunity disparities compound over time, with Black FAs receiving less compensation and fewer career advancement opportunities than their white peers, while simultaneously being at increased risk for PIPs and termination.

37. Plaintiffs' experiences illustrate this discrimination.

***Roland Martin***

38. Plaintiff Martin joined Edward Jones in July 2012. In 2013, after obtaining his financial advising licenses, he began working as an FA for a branch in Oakland, California. He received a small asset transfer through Edward Jones' Goodknight program comprised of around 100 accounts collectively valued around $1 million.

39. Both individually and collectively, the accounts Plaintiff Martin received were low quality, meaning they did not generate meaningful revenue through fees or commissions. Because Edward Jones expects FAs to provide quality customer service regardless of the size of the accounts, Plaintiff Martin still spent substantial amounts of time servicing these accounts, at the expense of prospecting for new clients. The result of receiving this book of business is that Plaintiff Martin struggled to gain clients and survive as an FA for Edward Jones for his entire tenure. For ten years – until he resigned from Edward Jones in September 2022 – Plaintiff Martin slowly built his book of business and managed to avoid termination. At the time he resigned, he had built a book of business between $40 and $50 million.

40. In contrast to Plaintiff Martin, new white FAs who started in the same cohort as Plaintiffs received much larger asset transfers at the beginning of their tenure, often valued over

$20 million or more and containing better quality assets. These white FAs were simply more profitable than Plaintiff Martin from the beginning of their employment, and many continued to earn more than Plaintiff Martin for years thereafter.

***Elwis Johnson***

41.     Plaintiff Johnson joined Edward Jones as an FA beginning around July 2017. Prior to joining, Plaintiff Johnson worked in the banking and financial services industry. Plaintiff Johnson did not receive any asset transfers when he first joined Edward Jones. During training, however, he met many white FAs who were receiving asset transfers of $50 million or more. One individual from Oklahoma received a "pooled" Goodknight transfer of over $100 million in assets. Plaintiff Johnson was surprised to learn that this FA – like many others in his training class – did not have financial backgrounds like he did. These FAs were shocked that Plaintiff Johnson had not yet received any asset transfers.

42.     For the first few years as an FA, Plaintiff Johnson made so little income at Edward Jones he had to drive for ride-share apps (e.g., Uber) to make ends meet and support his family.

43.     Around 2019, Plaintiff Johnson received an "Open Office" transfer of around $25 million. Over the next 4 years, he grew his book of business to around $37 million – still at least $13 million dollars less than many of the white FAs he spoke with during training.

44.     Plaintiff Johnson left Edward Jones in March 2023 for better opportunities.

***Trevor Edwards***

45.     Plaintiff Edwards joined Edward Jones as an FA in Brooklyn, New York around July 2023. During the interview process, Edward Jones told Plaintiff Edwards that it provides client accounts to new FAs because it is impossible to survive without any starting assets.

46.     In December 2023, Plaintiff Edwards attended FA training in December 2023 at Edward Jones' headquarters in St. Louis, Missouri. During training, Plaintiff Edwards learned

that some white FAs in his cohort were getting upwards of $20 million in asset transfers. For example, one white FA received an asset transfer of over $20 million. Another white FA received a book of business that was upwards of $30 million.

47. After training, Plaintiff Edwards started working as an FA at Edward Jones' Williamsburg Branch in Brooklyn. The senior FA at the branch, Roland Bravo, was a white man who had received more than $30 million in Goodknight asset transfers when he began working as an FA in 2019.

48. In December 2023 or January 2024, Plaintiff Edwards received a $5.1 million Goodknight transfer. Almost immediately, however, two white senior FAs poached the best clients from Plaintiff Edwards' book of business, leaving him with only $2.5 million worth of business. The remaining assets were low-quality and generated almost no income whatsoever.

49. Plaintiff Edwards worked tirelessly to try to build his book of business, but he ultimately could not recover. In addition, because Plaintiff Edwards was initially awarded a $5.1 million book of business, Edward Jones set performance standards for him at a "P2" level – meaning he was being evaluated as someone who received over $5 million in assets, even though in reality he received assets worth just $2.5 million. Despite assuring Plaintiff Edwards that he would not be held to the "P2" performance standards because his assets had been taken by other FAs, Edward Jones put him on a PIP in October 2024 and terminated him in February 2025.

*Shawna Knutson*

50. Plaintiff Knutson worked as an FA at Edward Jones' Pequot Lakes, Minnesota Branch starting around July 2023. Between July and November 2023, Plaintiff Knutson completed her training and licensing, during which she learned that new FAs routinely inherit client accounts from other FAs. Plaintiff Knutson then began working as an FA in the office of Bruce Meade, a

veteran FA (and white male) who planned to retire soon and have a new FA take over the Pequot Lakes Branch.

51.     In September or October of 2023, Mr. Meade made a Goodknight transfer of $10 million of assets to Plaintiff Knutson.  However, all of the assets in the Goodknight transfer were low-quality, meaning they generated little revenue and took a substantial amount of time to service. For example, one client in the book of business had already passed away.  Another client's health condition required Plaintiff Knutson to communicate with the client's family to execute any transactions.  Many assets were dormant and the clients to whom these assets belonged would not return her calls at all.

52.     Plaintiff Knutson was the only Black FA out of about 60 FAs in her geographic area, and Plaintiff Knutson learned that white and male FAs in her region were treated and paid better than she was.  For example, two white male FAs who were hired around the same time as she was and had no prior experience as FAs received far more assets than she did when they started at Edward Jones.  One white FA at the Brainerd, Minnesota Branch received $77 million in assets and another receive three asset transfers that totaled well over $10 million and enabled him to open his own office and hire a Branch Office Administrator ("BOA") to assist with administrative functions.

53.     In April 2024, six months after she began working as an FA in the Pequot Lakes Branch, Plaintiff Knutson learned that Mr. Meade transferred a $44 million book of business to a white FA.  This advisor was brand new to Edward Jones, had no experience as an FA, and, indeed, had to shadow Plaintiff Knutson to learn how to be an FA.  The following fall, Plaintiff Knutson discovered that Mr. Meade intended to have this white FA, rather than her, eventually take over the Branch.

54. Plaintiff Knutson repeatedly complained to her Regional Leader, Robert Zaun, about Mr. Meade's unfair asset transfers but Mr. Zaun took no steps to remedy the discriminatory treatment.

55. Edward Jones placed Plaintiff Knutson on a PIP in December 2024 and she resigned shortly thereafter on December 27, 2024.

### *Santoria Texidor*

56. Plaintiff Texidor was recruited to Edward Jones in March 2025. The recruiter repeatedly told Plaintiff Texidor that she would receive assets from Edward Jones when she began her employment as an FA.

57. Plaintiff Texidor accepted a position in the Decatur, Georgia Branch and began working as an FA on May 30, 2025. In August 2025, Plaintiff Texidor attended a training at Edward Jones' corporate office in St. Louis. There were approximately thirty to fifty FAs at the training, but only three Black FAs. At the training, Plaintiff Texidor met a white FA who worked out of the Statesboro, Georgia Branch. Despite also being new to Edward Jones (and considered a Level 0, like Plaintiff Texidor), this white FA told Plaintiff Texidor that he received $23 million in Goodknight asset transfers and that the senior FA in his Branch funneled lower-value assets to him. Edward Jones also provided this FA with his own BOA to support his business.

58. In contrast to this FA, Plaintiff Texidor never received any asset transfers, through the Goodknight program or otherwise, while she worked at Edward Jones. At the same time, a senior white FA in her branch funneled lower-value assets to another white FA in another branch (the Avendale Estates Branch, which was also in Decatur). This senior white FA also told Plaintiff Texidor not to use the BOA.

59. Plaintiff Texidor left Edward Jones around August 2025 due to the discriminatory treatment she experienced.

*Alonzo Hinton*

60.     Plaintiff Hinton worked for Edward Jones as an FA starting around March 2023. Prior to joining, Edward Jones' hiring managers told him that Edward Jones would "give [him] a book of business."  Plaintiff Hinton's starting salary was around $50,000 to $60,000 per year.

61.     Early in his tenure, Mr. Hinton received a Goodknight asset transfer of low-quality client accounts.  These assets were "bottom of the barrel" assets.  They did not generate more than $2 per month in fees.

62.     During training, Mr. Hinton was the only Black FA in his cohort.  He learned of other white FAs who walked into far better situations in other offices in Georgia, Michigan, and Texas.

63.     Because of Plaintiff Hinton's low-value assets, he struggled to meet Edward Jones' revenue expectations.  Edward Jones placed him on a PIP in January 2024 and terminated him in April 2024.

## Salary Assignment Policy

64.     Edward Jones' SAP is a company-wide policy created and implemented by the Home Office.  Per the SAP, a new FA's starting salary is determined based on a percentage of the compensation that FA earned immediately prior to starting with Edward Jones.  To implement the SAP, Edward Jones collects information about an FA candidate's salary history during the interview process.

65.     The SAP replicates race-based pay disparities present in the labor market, resulting in Black FAs receiving lower starting salaries than their white peers.  Many states have directly banned salary history inquiries, as they are a "root cause of continued wage inequality" for women and minorities.  N.Y. Senate Bill 2019-S6549, Sponsor Memo (June 17, 2019) (discussing justification for salary history ban in N.Y. Labor Law § 194-a); *see also, e.g.*, Wash. Rev. Code §

49.58.005(3)(a) ("The legislature finds that. . . [t]he long held practice of inquiring about salary history has contributed to persistent earning inequalities."); Cal. Labor Code § 432.3 (prohibiting reliance on the salary history of job applicants).

66. For example, Edward Jones requested information about Plaintiff Knutson's prior compensation, including W-2 forms, which she provided. Plaintiff Knutson saw an Edward Jones document explaining that an FA's prior compensation determined his or her starting salary at Edward Jones. Because Plaintiff Knutson's compensation for her most recent position as a credit analyst for a bank was low, Edward Jones set her starting salary at the very bottom of its pay scale, around $40,000.

67. Similarly, during the application process, Edward Jones required Plaintiff Johnson to disclose his most recent salary history. Because Edward Jones' SAP assigns starting pay on an applicants' immediate prior salary, Plaintiff Johnson received an offer at the "firm minimum" – which at the time was around $38,000 per year. Plaintiff Johnson tried to negotiate upwards, but Edward Jones refused to meaningfully deviate from its salary history rubric. As a result, Plaintiff Johnson's joined Edward Jones with a starting salary around $40,000.

68. On information and belief, as a result of Edward Jones' SAP, white FAs on average receive higher starting salaries than Black FAs, causing pay discrimination.

**Edward Jones' Culture of Discrimination**

69. Edward Jones also maintains a culture of racial discrimination.

*Elwis Johnson*

70. For example, Plaintiff Johnson was subjected to racially discriminatory comments during his time at Edward Jones. Around 2021, Plaintiff Johnson was discussing client work with a newer white FA at an Edward Jones networking event. The white FA described a type of client that received an inheritance and then spent it all at once as "[N-word]-rich," which is a racist phrase

that implies Black people are irresponsible with their wealth. Plaintiff Johnson reported this incident to his Regional Leader, Jim Boora. Edward Jones did not take any disciplinary action against this FA. On information and belief, the white FA later received a new office and still works for Edward Jones today.

### Roland Martin

71. Throughout Plaintiff Martin's tenure, Edward Jones regularly made it more difficult for him to succeed than his white colleagues. As one example, around 2014, a retiring advisor ("Jerry") told Plaintiff Martin he was going to retire and leave Plaintiff Martin with $4 to $5 million in assets. Edward Jones blocked the transfer on the basis that Plaintiff Martin, at the time, did not have enough existing assets and was struggling to meet performance expectations. After his Regional Leader explained these reasons to him, Plaintiff Martin complained to Edward Jones' Home Office. Over two years later, Plaintiff Martin received some of the assets that Jerry had initially sought to transfer to him.

72. As another example, around 2018, Edward Jones divided and distributed a $200 million book of business from a departing FA in Plaintiff Martin's region. Edward Jones allocated $30 million transfer to 6 different FAs in the region, including white FAs, but distributed no portion of this set of assets to Plaintiff Martin.

73. As a final example, around May 2022, Plaintiff Martin had a meeting with Edward Jones' Compliance Director, Regional Leader, and three other members of Edward Jones' management to discuss his performance. After going through his existing book of business comprised of primarily Black households, the Compliance Director stated, "Maybe the type of clients that you're getting aren't ideal for Edward Jones." Plaintiff Martin understood this

comment to be racial. Plaintiff Martin resigned from Edward Jones in September 2022 to start his own practice, where his "type of clients" would be appreciated.

### Shawna Knutson

74.     Plaintiff Knutson had little support in growing her book of business and senior white FAs like Mr. Meade actively hindered her ability to do so. For example, Mr. Meade (1) frequently cancelled transition client meetings Plaintiff Knutson had scheduled; (2) refused to put Plaintiff Knutson's name on the door of the office (even though she paid half of the rent for the office); (3) regularly "closed" the office (*i.e.*, indicated the branch was not accepting new clients) without consulting her, and (4) was frequently out of the office and unavailable. To make matters worse, the Pequot Lakes BOA (who was a white woman) did not pass along messages to Plaintiff Knutson if clients called the office asking for her.

75.     As noted above, Plaintiff Knutson repeatedly complained to her Regional Leader, about Mr. Meade's unfair asset transfers but Mr. Zaun took no steps to remedy the discriminatory treatment. In January 2025, Mr. Zaun contacted Plaintiff Knutson to offer her a "remote" FA position and introduce her to the Area Leader, Shellie Haluska. Ms. Haluska offered to reinstate Plaintiff Knutson's job at the Pequot Lakes Branch and told her that Mr. Meade had handled the office transfer inappropriately and treated her unfairly. Plaintiff Knutson declined Mr. Zaun's and Ms. Haluska's offers of reinstatement, as neither offer came with assurances that she would receive sufficient assets to succeed like her male and white peers.

### Santoria Texidor

76.     Plaintiff Texidor also experienced a culture of discrimination at Edward Jones. Before joining, she interviewed with two different Edward Jones branches – the Decatur Branch and the Sandy Spring Branch. During her interview with the Sandy Springs Branch, Plaintiff Texidor was told by a senior white FA that she should use a more race-neutral name (such as her

middle name, Simone, rather than her first name, Santoria). This white FA then declined to hire Plaintiff Texidor as an FA at the Sandy Springs Branch.

77. In June 2025, Plaintiff Texidor attended a training program called "Summer Regionals," which was an opportunity for Edward Jones FAs to network with other FAs and attend classes related to the financial services industry. At Summer Regionals, other Black FAs expressed to Plaintiff Texidor that Black FAs at Edward Jones face racial discrimination. For example, on June 12, 2025, Plaintiff Texidor sat at a table with two Black senior FAs, who discussed how few African-American FAs were present at Summer Regionals and how there was a double standard with respect to the work expectations and achievements of Black FAs compared to their non-Black peers. One of these FAs, a top advisor in the Region, mentioned that he believed that his work had been diminished and unrecognized because of his race. Later that same day, another Black FA relayed to Plaintiff Texidor that she experienced racial discrimination at Edward Jones.

78. Around July 2025, Plaintiff Texidor noticed that Edward Jones had posted an image of a white FA, instead of an image of Plaintiff Texidor, on the website for the Decatur Branch and in its CRM system. Because of this, when clients called the Decatur Branch to schedule a meeting, they made comments to Plaintiff Texidor such as, "You don't sound like your picture." One potential client who visited the Branch in person seemed surprised that Plaintiff Texidor was the FA who was going to handle his account.

### Trevor Edwards

79. Edward Jones does not take the complaints of its Black employees seriously or take action to correct discriminatory treatment. For example, Plaintiff Edwards emailed Edward Jones' CEO Penny Pennington to express his frustrations about his experience as an FA after his termination. Plaintiff Edwards described how he was not provided fair opportunities compared to

his peers; how Edward Jones' asset transfer program was not the merit-based opportunity that Edward Jones promised; how his presence at Edward Jones was neither valued nor respected; and how he felt singled out by the experience. Although Edward Jones' human resources department later contacted Mr. Edwards about the complaint, it did not take any action in response.

**Knowing and Intentional Discrimination**

80. Edward Jones' maintenance of these unlawful practices is knowing, intentional, and willful. Around 2018, Edward Jones modified its "Goodknight" program to provide a 10% incentive payment to advisors whose assets went to new diverse FAs and women. These payments primarily went to Edward Jones' predominantly white FAs. Edward Jones maintained this incentive program until 2025 when it withdrew any references to Diversity, Equity, and Inclusion initiatives.[9]

81. Furthermore, just five years ago Edward Jones settled the *Bland* case, which similarly alleged that Edward Jones' asset transfer programs discriminated against Black FAs. *See Bland v. Edward D. Jones & Co., L.P.*, No. 18 Civ. 3673, 2020 WL 7027595, at \*14-16 (N.D. Ill. Nov. 30, 2020) (denying motion to dismiss race discrimination claims). Despite this settlement, which included programmatic relief aimed at remedying racial inequity at the firm, Edward Jones has continued to maintain the same asset transfer policies and practices that harm Black FAs today. Edward Jones is currently defending a lawsuit alleging that the same CTP at issue here discriminates against women FAs nationwide. *See Dixon v. Edward Jones*, Case No. 4:22-cv-00284 (E.D. Mo. 2022). Finally, Edward Jones knew or should have known that setting starting salaries based on applicants' prior income perpetuates wage discrimination.

---

[9] *See supra* note 1.

82. There is no reasonable or legitimate business purpose for Edward Jones' discriminatory CTP and SAP.

## CLASS ACTION ALLEGATIONS

83. Plaintiffs incorporate by reference the preceding paragraphs and allegations in the Complaint.

84. Plaintiffs bring this action on behalf of themselves and all similarly situated Black FAs. For all the **Classes** described below, they seek injunctive and declaratory relief under Fed. R. Civ. P. 23(a), (b)(2), and (c)(4); as well as monetary damages and other make-whole relief under Fed. R. Civ. P. 23(a) and (b)(3).

85. All Plaintiffs bring class allegations on behalf of a nationwide **Section 1981 Class**, defined as follows:

All current and former Black FAs employed by Edward Jones nationwide from four years prior to the filing of this Complaint to the resolution of this action. This class definition excludes Home Office FAs.

86. Plaintiffs Edwards, Knutson, and Texidor bring class allegations on behalf of a nationwide **Title VII Class**, defined as follows:

All current and former Black FAs employed by Edward Jones nationwide from December 11, 2024 to the resolution of this action. This class definition excludes Home Office FAs.

87. Plaintiff Martin brings class allegations on behalf of a **California Class**, defined as follows:

All current and former Black FAs employed by Edward Jones in California from four years prior to the filing of this Complaint to the resolution of this action. This class definition excludes Home Office FAs.

88. Plaintiff Edwards brings class allegations on behalf of a **New York State Class**

defined as follows:

All current and former Black FAs employed by Edward Jones in New York from six years prior to the filing of this Complaint to the resolution of this action. This class definition excludes Home Office FAs.

89. Plaintiff Edwards additionally brings class allegations on behalf of a **New York City Class** defined as follows:

All current and former Black FAs employed by Edward Jones in New York City from three years prior to the filing of this Complaint to the resolution of this action for claims under the NYCHRL. This class definition excludes Home Office FAs.

90. Plaintiff Knutson additionally brings class allegations on behalf of a **Minnesota Class** defined as follows:

All current and former Black FAs employed by Edward Jones in Minnesota from three years prior to the filing of this Complaint to the resolution of this action for claims under the MHRA. This class definition excludes Home Office FAs.

91. Plaintiffs are members of the Classes they seek to represent.

92. Plaintiffs may amend the above class definitions as permitted or required by this Court. This action has been brought and may properly be maintained as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure because all the prerequisites for class treatment are met.

**Rule 23(a)(1) – Numerosity**

93. The potential members of the Classes as defined above are so numerous that joinder is impracticable. While the precise number of Black FAs in each geographic area is unknown, Edward Jones has employed hundreds of Black FAs nationwide, in California, in New York, and

23

in Minnesota during the relevant time periods. Edward Jones' records will provide information as to the number and location of Class members that will allow the class to be ascertained.

**Rule 23(a)(2) – Common Questions of Law and Fact**

94. There are questions of law and fact common to the Classes predominating over any questions affecting only Plaintiffs or any other individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Edward Jones intentionally (or with reckless indifference) discriminated against Black FAs on the basis of race with respect to their compensation, terms, and conditions of employment, in violation of Section 1981, Title VII, California, New York, and Minnesota law.

b. Whether Edward Jones has engaged in a pattern and practice of discrimination against Black FAs with respect to their compensation, terms, and conditions of employment, in violation of Section 1981, Title VII, California, New York, and Minnesota law.

c. Whether Edward Jones' policies and practices have a disparate impact on the compensation, terms, and conditions of employment of Black FAs, in violation of Title VII, California, New York, and Minnesota law.

d. Whether Edward Jones pays Black FAs less than non-Black FAs for substantially similar work, in violation of California and New York law.

e. Whether Edward Jones' challenged policies or practices are necessary to their business operations;

f. Whether Plaintiffs and the members of the Classes are entitled to declaratory, injunctive and other equitable relief; and

g. Whether Plaintiffs and the members of the Classes are entitled to compensatory damages and any other relief as provided by law.

**Rule 23(a)(3) – Typicality**

95. The claims of the named Plaintiffs are typical of the claims of the Classes they seek to represent. Plaintiffs and all Class members sustained injuries and damages arising out of and caused by Defendants' common unlawful compensation practices in violation of Federal, California, New York, and Minnesota laws, regulations, and statutes as alleged here.

**Rule 23(a)(4) - Adequacy of Representation**

96. Plaintiffs will fairly and adequately represent and protect the interests of the Class members.

97. Plaintiffs' counsel is competent and experienced in litigating class actions. Outten & Golden LLP and Stueve Siegel Hanson have previously litigated class actions challenging pay discrimination in the financial services industry.

**Rule 23(b)(2) and (c)(4) – Injunctive and Declaratory Relief**

98. Classwide injunctive and declaratory relief is appropriate because Edward Jones has acted or refused to act on grounds generally applicable to the Classes. Edward Jones client transfer and salary assignment policies are common, uniform, and discriminatory policies that apply equally to the Classes. Plaintiffs and the proposed Classes will seek a declaration that Edward Jones violated Section 1981, Title VII, NY EPL, NYHRL, NYCHRL, MHRA, and an injunction prohibiting Edward Jones from violating these statutes in the future. Should this matter be bifurcated into separate liability and damages phases, classwide injunctive and declaratory relief may be adjudicated in full at the liability phase.

<u>**Rule 23(b)(3) - Superiority of Class Action**</u>

99.     A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of all Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members.  Each member of the proposed Class has been damaged and is entitled to recovery by reason of Defendants' unlawful policies and practices of discriminating against Black FAs on the basis of race with respect to their compensation, terms, and conditions of employment.

100.    No other litigation concerning this controversy has been commenced by or against Plaintiffs.

101.    Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. It is unlikely that individual Class members have any interest in individually controlling separate actions in this case.

102.    Plaintiffs  are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.  The benefits of maintaining this action on a class basis far outweigh any administrative burden in managing the class action.  Conducting the case as a class action would be far less burdensome than prosecuting numerous individual actions.

**<u>FIRST CLAIM FOR RELIEF</u>**
**Race Discrimination**
**(42 U.S.C. § 1981)**
**On behalf of Plaintiffs and the Section 1981 Class**

103.    Plaintiffs incorporate by reference the preceding paragraphs and allegations in the Complaint.

104. This Count is brought on behalf of Plaintiffs and the Section 1981 Class. Plaintiffs and members of the Section 1981 Class are Black employees of Edward Jones who worked or work as FAs.

105. Throughout the Relevant Period, Edward Jones has maintained a nationwide set of uniform, discriminatory employment practices and engaged in a pattern or practice of discrimination against Plaintiffs and the Section 1981 Class.

106. As Black FAs subject to Edward Jones' CTP and SAP, Plaintiffs and members of the Section 1981 Class were compensated less than similarly situated white FAs for performing the same or similar work, and failed to receive the same business opportunities as white FAs performing the same or similar work.

107. Edward Jones knows that Black FAs are and were compensated less than white FAs because of their race. Edward Jones' actions and omissions were malicious and/or recklessly indifferent to the rights of Plaintiffs and the proposed Section 1981 Class.

108. Edward Jones conducts business in the United States and, as such, is obligated to comply with the provisions of 42 U.S.C. § 1981.

109. Section 1981 guarantees persons of all races the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, as well as all benefits, privileges, terms, and conditions of the contractual relationship.

110. Through these policies and practices, Edward Jones intentionally discriminated against Plaintiffs and members of the Section 1981 Class on the basis of race by denying them their right to make and enforce contracts, including the enjoyment of benefits, privileges, terms, and conditions of their employment with Edward Jones.

111. But for their race and Edward Jones' unlawful conduct, Plaintiffs and members of the Section 1981 Class would not have suffered (and would not continue to suffer) harm in their terms and conditions of employment, including, but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial losses, as well as non-economic damages.

112. Plaintiffs request that the Court issue a permanent injunction ordering Edward Jones to alter its compensation policies and practices to prevent further violations on the basis of race. Plaintiffs and the Section 1981 Class are now suffering, and will continue to suffer, irreparable injury from Edward Jones' discriminatory acts and omissions.

<u>**SECOND CLAIM FOR RELIEF**</u>
**Intentional Discrimination**
**(Title VII, 42 U.S.C. § 2000e *et seq.*)**
**On behalf of Plaintiffs Edwards, Texidor, and Knutson and the Title VII Class**

113. Plaintiffs incorporate by reference the preceding paragraphs and allegations in the Complaint.

114. This claim for relief is brought by Plaintiffs Edwards, Texidor, and Knutson on behalf of themselves and the Title VII Class they represent. Plaintiffs have timely filed charges with the EEOC and have exhausted their administrative remedies.

115. Edward Jones has engaged in an intentional, company-wide, and systemic policy, pattern and/or practice of discrimination against Black FAs. Edward Jones has intentionally discriminated against Plaintiffs and the Title VII Class in violation of Title VII by, among other things:

  a. Utilizing a biased system for setting starting pay (the SAP) that relies on an FA's prior salary history;

  b. Utilizing a biased compensation system (the CTP) that transfers client accounts primarily to white FAs and not Black FAs; and

c. Failing to take reasonable and adequate steps to prevent and correct the use of these unvalidated and biased practices to determine the terms and conditions of employment.

116. These company-wide policies are intended to and do have the effect of:

a. Denying Plaintiffs and the Title VII Class compensation in the form of commissions and bonuses;

b. Denying Plaintiffs and the Title VII Class future business opportunities;

c. Evaluating Plaintiffs and the Title VII Class's performance more negatively because of their race, causing higher termination and attrition rates; and

d. Offering Plaintiffs and the Title VII Class less administrative support, training, and mentorship as a result of discriminatory performance measures that systematically disadvantage them because of their race.

117. These discriminatory acts constitute a pattern and/or practice of discrimination which have occurred both within and outside of the liability period in this case.

118. As a direct result of Edward Jones' discriminatory policies and/or practices as described above, Plaintiffs and the Title VII Class have suffered damages including, but not limited to, past and future income, compensation, and benefits.

119. The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by Title VII.

120. Plaintiffs request relief as hereinafter described.

<strong><u>THIRD CLAIM FOR RELIEF</u></strong><br>
<strong>Disparate Impact Discrimination</strong><br>
<strong>(Title VII, 42 U.S.C. § 2000e <em>et seq.</em>)</strong><br>
<strong>On behalf of Plaintiffs Edwards, Texidor, and Knutson and the Title VII Class</strong>

121. Plaintiffs incorporate by reference the preceding paragraphs and allegations in the Complaint.

122. This claim for relief is brought by Plaintiffs Edwards, Texidor, and Knutson on behalf of themselves and the Title VII Class they represent. Plaintiffs have timely filed charges with the EEOC and have exhausted their administrative remedies.

123. Edward Jones' CTP and SAP practices have an adverse impact on the compensation, terms, and conditions of employment of Black FAs.

124. Edward Jones' reliance on illegitimate and unvalidated systems and criteria to set compensation for FAs violates Title VII and is not – and cannot be – justified by business necessity. Even if these practices could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

125. Edward Jones has maintained these discriminatory policies and practices both within and outside the liability period in this case.

126. As a direct result of Edward Jones' discriminatory policies and practices described herein, Plaintiffs Edwards, Texidor, Knutson and the Title VII Class have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

127. The foregoing policies, patterns, and/or practices have an unlawful disparate impact on Black FAs nationwide, in violation of Title VII.

128. Plaintiffs request relief as hereinafter described.

**FOURTH CLAIM FOR RELIEF**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code § 17200 *et seq.*)**
**On behalf of Plaintiff Martin and the California Class**

129. Plaintiffs incorporate by reference the preceding paragraphs and allegations in the Complaint.

130. This claim for relief is brought by Plaintiff Martin and the California Class.

131. Edward Jones' policy and practice of paying Black FAs less than white FAs for substantially similar work violates the California Equal Pay Act, Labor Code § 1197.5, because the statute prohibits pay discrimination based on race. In addition, Edward Jones' failure to pay Black FAs all wages due violates California Labor Code §§ 201, 202, and 203. Accordingly, Edward Jones' policies and practices, as alleged herein, constitute unlawful or unfair business practices prohibited by Business & Professions Code § 17200 *et seq.*

132. Edward Jones' unlawful and/or unfair business practices entitle Plaintiff Martin and the California Class to preliminary and permanent injunctive relief, restitution, and other equitable relief available for violations of the UCL.

133. Plaintiffs request relief as hereinafter described.

**FIFTH CLAIM FOR RELIEF**
**Unlawful Pay Disparity**
**(New York Equal Pay Law, N.Y. Labor Law §§ 194 et seq.)**
**(On behalf of Plaintiff Edwards and the New York State Class)**

134. Plaintiff Edwards incorporates by reference the preceding paragraphs as alleged above.

135. This Claim for Relief is brought on behalf of Plaintiff Edwards and the New York State Class.

136. Pursuant to the New York Equal Pay Law ("NY EPL"), N.Y. Labor Law §§ 194 et seq., it is unlawful for an employer to pay employees unequally on the basis of a protected class

31

for substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

137. Edward Jones discriminated against Plaintiff Edwards and the New York State Class by paying them less than they paid non-Black comparators who were performing substantially similar work and by subjecting them to common discriminatory pay policies, including, but not limited to, the CTP and SAP, in violation of the NY EPL.

138. As a result of this conduct, Plaintiff Edwards and the New York State Class have suffered harm, including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

139. Edward Jones knowingly underpaid Plaintiff Edwards and the New York State Class, as alleged. This knowing underpayment constitutes a willful violation of N.Y. Labor Law § 194.

140. Plaintiffs request relief as hereinafter described.

### SIXTH CLAIM FOR RELIEF
**Intentional Discrimination**
**(NYCHRL, New York City Administrative Code §§ 8-107 et seq.)**
**(On Behalf of Plaintiff Edwards and the New York City Class)**

141. Plaintiff Edwards incorporates by reference the preceding paragraphs as alleged above.

142. This Claim for Relief is brought by Plaintiff Edwards and the New York City Class.

143. Edward Jones has engaged in an intentional, company-wide, and systematic policy, pattern, and/or practice of discrimination against Plaintiff Edwards and the New York City Class in violation of the NYCHRL by, among other things intentionally maintaining and utilizing the CTP and SAP, which perpetuate and increase discrimination against Black employees.

144. Edward Jones' discriminatory policies or practices described above have denied Black employees business opportunities and compensation, in the form of lost past and future wages and other job benefits, as compared to similarly-situated non-Black employees.

145. Edward Jones has set and/or maintained these discriminatory policies, patterns, and/or practices within the City of New York, and the discriminatory policies, patterns, and/or practices have had a discriminatory effect on Black employees within the City of New York.

146. As a direct result of Edward Jones' discriminatory policies and/or practices as described above, Plaintiff Edwards and the New York City Class have suffered damages including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

147. The foregoing conduct, as alleged, constitutes illegal, intentional discrimination prohibited by the Administrative Code of the City of New York § 8-107 et seq. 96.

148. Plaintiffs request relief as hereinafter described.

**SEVENTH CLAIM FOR RELIEF**
**Disparate Impact Discrimination**
**(NYCHRL, New York City Administrative Code §§ 8-107 et seq.)**
**(On Behalf of Plaintiff Edwards and the New York City Class)**

149. Plaintiff Edwards incorporates by reference the preceding paragraphs as alleged above.

150. This Claim for Relief is brought by Plaintiff Edwards and the New York City Class.

151. Edward Jones' maintenance and utilization of the CTP and SAP has had an adverse impact on Plaintiff Edwards and the New York City Class in violation of the NYCHRL.

152. Edward Jones' conduct cannot be justified by any legitimate business necessity. Even if such policies could be justified by business necessity, less discriminatory alternatives exist that would equally serve any alleged necessity.

153. Edward Jones' discriminatory policies, patterns, and/or practices have had a discriminatory impact on Plaintiff Edwards and the New York City Class.

154. As a direct result of Edward Jones' discriminatory policies and/or practices as described above, Plaintiff Edwards and the New York City Class have suffered damages including, but not limited to, lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

155. The foregoing policies, patterns, and/or practices have an unlawful disparate impact on Black employees in violation of the Administrative Code of the City of New York §§ 8-107 et seq.

156. Plaintiffs request relief as hereinafter described.

**EIGHTH CAUSE OF ACTION**
**Disparate Impact Discrimination**
**(NYSHRL, Executive Law §§ 296-301)**
**(On Behalf of Plaintiff Edwards and the New York State Class)**

157. Plaintiff Edwards incorporates by reference the preceding paragraphs as alleged above.

158. This Claim is brought by Plaintiff Edwards and the New York State Class.

159. Edward Jones' maintenance and utilization of the CTP and SAP has had an adverse impact on Plaintiff Edwards and the New York State Class in violation of the NYSHRL.

160. Edward Jones' conduct cannot be justified by any legitimate business necessity. Even if such policies could be justified by business necessity, less discriminatory alternatives exist that would equally serve any alleged necessity.

161. Edward Jones' discriminatory policies, patterns, and/or practices have had a discriminatory impact on Plaintiff Edwards and the New York State Class.

162. As a direct result of Edward Jones' discriminatory policies and/or practices as described above, Plaintiff Edwards and the New York State Class have suffered damages including, but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

163. The foregoing policies, patterns, and/or practices have an unlawful disparate impact on Black employees in violation of the Executive Law of the State of New York §§ 296-301 et seq.

164. Plaintiffs request relief as hereinafter described.

**NINTH CAUSE OF ACTION**
**Pay Discrimination**
**(MHRA, Minn. Rev. Stat. § 363A.08)**
**(On Behalf of Plaintiff Knutson and the Minnesota Class)**

165. Plaintiff Knutson incorporates by reference the preceding paragraphs as alleged above.

166. This Claim is brought by Plaintiff Knutson and the Minnesota Class.

167. Through its maintenance and utilization of the discriminatory policies or practices described above, including the CTP and SAP, Edward Jones has discriminated against Plaintiff Knutson and the Minnesota Class with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment.

168. Edward Jones' maintenance and utilization of these discriminatory policies or practices are not based on a bona fide occupational qualification or justified by any legitimate business necessity.

169. Edward Jones' discriminatory policies, patterns, and/or practices have had a discriminatory impact on Plaintiff Knutson and the Minnesota Class, causing damages including,

but not limited to, lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

170. Plaintiffs request relief as hereinafter described.

### **<u>RELIEF</u>**

WHEREFORE, PLAINTIFFS request the following relief:

i. Certify the proposed Classes;

ii. Certify Plaintiffs as class representatives on behalf of the respective Classes;

iii. Issue a declaratory judgment that Defendants' policies are discriminatory and violate Section 1981, Title VII, the UCL, the NY EPL, the NYSHRL, the NYCHRL, and the MHRA, and that such discriminatory conduct was malicious and/or recklessly indifferent;

iv. Issue a permanent injunction against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful policies and practices set forth herein;

v. Award Plaintiffs and the Classes compensatory and punitive damages in an amount to be determined at trial;

vi. Award Plaintiffs and the Classes restitution in the amount of benefits and compensation lost and that they will lose in the future as a result of Defendants' unlawful conduct.

vii. Award to Plaintiffs and the Classes reasonable attorneys' fees and costs to the extent allowable by law, along with pre- and post-judgment interest; and

viii. Award such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand trial of these claims by jury.

Respectfully submitted,

Dated: May 19, 2026

By: /s/ Adam T. Klein
Adam T. Klein*
Chauniqua D. Young*
Michael Danna
**OUTTEN & GOLDEN LLP**
685 Third Avenue, 25th Floor
New York, NY 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2005
Email: atk@outtengolden.com
Email: cyoung@outtengolden.com
Email: mdanna@outtengolden.com

Ryan C. Cowdin*
**OUTTEN & GOLDEN LLP**
1225 New York Ave NW, Suite 1200B
Washington, DC 20005
Telephone: (202) 847-4400
Facsimile: (646) 952-9114
Email: rcowdin@outtengolden.com

Anne M. Weis*
**OUTTEN & GOLDEN LLP**
1999 Harrison Street, Suite 1500
Oakland, CA 94612
Telephone: (415) 638-8800
Facsimile: (415) 638-8810
Email: aweis@outtengolden.com

By: /s/ George A. Hanson
George Hanson (MO Bar 43450)
Jordan Kane (MO Bar 71028)
**STUEVE SIEGEL HANSON**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone.: 816.714.7100
Email: hanson@stuevesiegel.com
Email: kane@stuevesiegel.com

*Attorneys for Plaintiffs and the Proposed Class*

*\*Pro Hac Vice* Application Forthcoming